NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4724
_____

JEAN COLEMAN; DAVID COLEMAN, Guardians;
RODNEY JONES, Student
Appellants

v.

POTTSTOWN SCHOOL DISTRICT
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civ. Action No. 2-10-cv-07421)
District Judge: Honorable Eduardo C. Robreno
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 12, 2014
_____

Before: McKEE, Chief Judge, SMITH, and SHWARTZ, Circuit Judges.

(Filed: September 15, 2014)

_____

OPINION
_____

SHWARTZ, Circuit Judge.

Jean Coleman, David Coleman, and R.J. (collectively, "Appellants") appeal the

portion of the District Court's judgment affirming the state administrative agency's ("Hearing Officer's") determination that the Pottstown School District ("School District") provided R.J. with a free and appropriate public education ("FAPE"). Because of the governing standard of review, we are constrained to affirm.

I

As we write principally for the benefit of the parties, we recite only the essential facts and procedural history. R.J. attended public school in Baltimore but moved to the School District in 2006 shortly before entering tenth grade. Using R.J.'s school records from Baltimore ("Baltimore Records") and his performance during the first month of tenth grade, the School District created an Individualized Education Plan ("IEP") to address R.J.'s learning disability as required by the Individuals with Disabilities Education Act ("IDEA"), 29 U.S.C. § 1400 et seq.[1] This IEP ("2006 IEP") documented that R.J. was receiving passing grades in special education classes but that on two reading probes he performed at a 1.5 grade level with a base of 64 words correct per minute and 2.0 grade level with a base of 47 words correct per minute. The 2006 IEP identified reading fluency, written expression skills, math calculation, and math reasoning as R.J.'s areas of need and provided a single "measurable annual goal" for reading, writing, and

_____

[1] R.J. had been diagnosed with reactive attachment disorder, dysthymia, post-traumatic stress disorder (likely resulting from the death of his brother and incarceration of a parent), traumatic brain injury, and obsessive compulsive personality disorder. The Baltimore Records showed he also had problems with inattention, aggression, atypicality, and withdrawal, and suggested that he met the criterion for attention deficit hyperactivity disorder.

2

math, setting a grade level that R.J. was to achieve in each subject by the end of the school year. App. 178-80. The 2006 IEP also included a number of specially-designed instructions ("SDIs") that a neuropsychological evaluation performed in Baltimore had recommended for R.J., including a small classroom setting, cues to remain on task, extra time to complete tests, repeated directions, reading directions out loud, and dictation to a scribe.[2] The 2006 IEP also recommended a speech and language evaluation and provided for one-on-one reading instruction with a special education teacher trained in the Lindamood-Bell instructional method. The 2006 IEP also included a "Behavior Improvement Plan" that appeared to be a generic form on which R.J.'s name was handwritten. App. 185. Recognizing that R.J. was "at risk for emotional problems" and exhibited behaviors that impeded his learning or that of others, the 2006 IEP provided him with thirty minutes of counseling each week and stated that a functional behavioral assessment ("FBA") would be done if behavioral problems arose.[3] App. 174.

During the 2006-07 school year, R.J. exhibited disruptive behavior[4] but the School

---

[2] The neuropsychological evaluation recommended additional SDIs that were not contained in the 2006 IEP, including instruction in coping, problem-solving, organization, self-monitoring, and cognitive flexibility, as well as books on tape. The 2006 IEP also omitted the evaluation's recommended executive function aids, including watching for signs of inattention or problems with auditory processing, asking R.J. to repeat information to ensure his understanding, assisting R.J. with organizing his work into a binder, providing frequent breaks, and linking new learning with his interests.

[3] "An FBA is a process for getting information to understand the function or purpose of behavior in order to develop an effective intervention plan." App. 1173.

[4] He was argumentative, talked excessively in class, and used inappropriate language. His behavior deteriorated in the Fall of 2007.

District determined it was not severe enough to warrant anything beyond counseling as he was producing passing work. Moreover, the School District did not perform an FBA because it believed R.J. was acting out because he missed his family in Baltimore. Instead, the School District referred R.J. to the Student Assistance Program, which provided counseling and therapy outside of the school setting.[5]

In March 2007, R.J. was being instructed in reading at a second grade level and was receiving passing grades in his special education classes. Appellants, through their son, Michael Coleman, contacted the School District out of concern that R.J. was not making enough progress in reading. The School District then performed a speech and language screening, which did not reveal a need for further evaluation. By May 2007, R.J.'s reading fluency had improved to a second or third grade level with an increase of 37.5 words correct per minute.

In October 2007, the School District prepared another IEP ("2007 IEP") for R.J. The 2007 IEP was largely the same as the 2006 IEP but had a few material differences. First, the 2007 IEP showed that R.J. received low yet passing grades in his special education classes for reading, science, social studies, math and economics. Second, it no longer contained an annual measurable goal for writing, and, while the goals for reading and math increased by one grade level, the School District did not completely fill in the

_____

[5] The outcome of the referral is not part of the record.

4

math goal.[6]  Third, in addition to the SDIs listed in the 2006 IEP, the 2007 IEP directed that teachers seat R.J. near the area of instruction, reduce the quantity of written in-class work and tests, and permit use of a calculator.  Finally, the 2007 IEP maintained that R.J. was "at risk for emotional problems" and provided for thirty minutes of counseling per week, but did not direct that an FBA be performed.  App. 203.

On May 8, 2008, the School District evaluated R.J.'s literacy skills using standardized tests that showed that his scores fell in the kindergarten to first grade range for letter-word identification, passage comprehension, and writing samples, and the fourth grade range for applied problems and word attack.  The School District's reading probes also showed that his progress in reading fluency had slowed, but he maintained scores in the third grade level and increased by ten the number of words read per minute.

Ten days later, Appellants had R.J. evaluated by a private center ("Center") that provided reading instruction using the Lindamood-Bell method.  The evaluation showed that his reading ability was between a 1.8 and 3.5 grade level depending on the test administered.  R.J. withdrew from the School District and, in September 2008, enrolled at the Center at Appellants' expense.  He received reading and language instruction only and made significant progress.  By May 2009, R.J.'s word attack skills had increased from a 1.8 to 7.5 grade level, his sight word assessment had increased from a 3.1 to 7.3 grade level, and his oral reading fluency had increased from a 3.2 to 6.0 grade level.

---

[6] The goal stated that "[w]hen given a ~~4.0~~ 5.0 grade level math computation probe, Rodney will have a goal of ____ dcpm on 3 consecutive probes."  App. 207.

On May 13, 2009, Appellants filed an administrative due process complaint against the School District, alleging that it denied R.J. a FAPE.[7] After conducting a hearing, the Hearing Officer determined that the School District did not deny R.J. a FAPE.

Appellants appealed to the District Court, alleging violations of the IDEA, the Rehabilitation Act ("RA"), 29 U.S.C. § 794 et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq., and seeking relief in the form of compensatory education and tuition reimbursement. The District Court permitted Appellants to supplement the administrative record with (1) behavioral and disciplinary records; (2) R.J.'s work product; and (3) a report by Appellants' expert, Dr. Nancy Bloomfield. Dr. Bloomfield opined that R.J.'s IEPs were "among the most inadequate [she] ha[d] ever reviewed" and should have included additional goals for decoding, reading comprehension, writing, and math. App. 1178. She asserted that the School District's SDIs were "pro forma" and that it should have provided additional SDIs, such as audiobooks or text-to-speech software. App. 1177-78. She viewed his placement in a number of classes as a "great disservice" and that it would have been "reasonable to

---

[7] "A parent who believes that a school has failed to provide a FAPE may request a hearing, commonly known as a due process hearing." Mary T. v. Sch. Dist. of Phila., 575 F.3d 235, 240 (3d Cir. 2009). In Pennsylvania, the hearing is conducted by a Hearing Officer, Carlisle Area Sch. v. Scott P., 62 F.3d 520, 527 (3d Cir. 1995), and the burden of proof is on the party seeking relief, Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 62 (2005). A party aggrieved by the Hearing Officer's decision may file an appeal in federal district court. 20 U.S.C. § 1415(i)(2)(A); see also 22 Pa. Code § 14.162(o).

provide a much more intensive intervention program like Lindamood Bell." App. 1177.

Dr. Bloomfield opined that R.J. would benefit from one-on-one education outside a

setting that triggers his "emotional and behavioral resistance to learning," and that an

FBA and additional therapy sessions would allow him to learn more appropriate

behaviors and coping skills. App. 1175.

Dr. Samuel Brooks testified on behalf of the School District. Dr. Brooks

explained that R.J. received special education instruction in small classes for reading,

math, science, and writing and was found to have made progress based on his

performance in class, not the standardized tests relied on by Appellants, which he

explained are diagnostic and do not monitor progress. Dr. Brooks also observed that

R.J.'s behavior did not result in a loss of instructional time and that the School District

responded with counseling and a referral to the Student Assistance Program.[8]

The District Court affirmed in part and reversed in part the Hearing Officer's

decision, concluding that the IDEA's statute of limitations barred all claims that pre-

---

[8] Aside from Drs. Brooks and Bloomfield, the District Court heard testimony from Michael Coleman and had the transcripts from the administrative hearing embodying testimony from (1) the School District's Supervisor of Secondary Special Education, who testified about creating R.J.'s IEPs and her discussions with Michael Coleman about R.J. attending the Center; (2) a special education teacher at the School District, who testified about her experience teaching R.J. math and writing during his tenth grade year; (3) a special education teacher at the School District, who testified about creating R.J.'s IEPs, her training and experience teaching R.J. in the Lindamood-Bell instructional method, and R.J.'s progress; (4) the Director of the Center, who testified about its educational program and R.J.'s progress at the School District and Center; and (5) the Career Technical Director at the School District, who testified about transition services at the School District.

dated May 12, 2007, and that the School District did not thereafter deny R.J. a FAPE. Appellants only appeal the District Court's finding that the School District did not deny R.J. a FAPE.

II[9]

We exercise plenary review of the District Court's legal conclusions and review its findings of fact under a clearly erroneous standard.[10] D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 (3d Cir. 2010). "A finding of fact is clearly erroneous when, after reviewing the evidence, the court of appeals is left with a definite and firm conviction that a mistake has been committed." Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (quoting Oberti v. Bd. of Educ. Of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1220 (3d Cir. 1993)). Thus, even if we may have reached a

---

[9] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343 and 20 U.S.C. § 1415(i)(2), and we have jurisdiction pursuant to 28 U.S.C. § 1291.

[10] When reviewing "an appeal from a state administrative decision under the IDEA, district courts apply a . . . 'modified de novo' review." D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 (3d Cir. 2010). Under this standard, a district court must give "due weight" to the findings in the administrative proceedings. Id. Under the "due weight" standard, "[f]actual findings from the administrative proceedings are . . . considered prima facie correct." P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 734 (3d Cir. 2009) (internal quotation marks and citations omitted). Where the hearing officer hears live testimony, a district court must accept "credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (emphasis and internal quotation marks omitted). Within these confines, "a district court is authorized to make findings based on the preponderance of the evidence." D.S., 602 F.3d at 564.

different outcome, we must defer to the District Court's finding if there is evidence to support it.

## III

Congress enacted the IDEA to "[i]mprov[e] educational results for children with disabilities." 20 U.S.C. § 1400(c)(1). The IDEA requires that states receiving federal education funding provide a FAPE to disabled children until they reach 21 years of age. Jonathan H. v. Souderton Area Sch. Dist., 562 F.3d 527, 528 (3d Cir. 2009). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." Ridley Sch. Dist. v. M.R., 680 F.3d 260, 268-69 (3d Cir. 2012) (internal quotation marks and citations omitted). The "primary mechanism for delivering a FAPE" is the IEP, which must include an assessment of the child's current educational performance, articulate measurable educational goals, and specify the nature of special services that the school will provide. Id. at 269 (internal quotation marks omitted); 20 U.S.C. § 1414(d)(1).

An IEP must be "reasonably calculated to enable the child to receive educational benefits." Mary T. v. Sch. Dist. of Phila., 575 F.3d 235, 249 (3d Cir. 2009) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982)). "Although the IEP must provide the student with a 'basic floor of opportunity,' it does not have to provide 'the optimal level of services,' or incorporate every program requested by the child's parents." Ridley, 680

F.3d at 269 (internal citations omitted). Thus, a school district need not "maximize the potential of every handicapped child, [but] must supply an education that provides 'significant learning' and 'meaningful benefit' to the child." Id. (internal citations omitted). "The issue of whether an IEP is appropriate is a question of fact." D.S., 602 F.3d at 564 (internal quotation marks and citations omitted).

Appellants argue that the District Court erred in finding that the IEPs were appropriate because, Appellants contend, they were lacking in several respects. First, they contend that the IEPs failed to adopt each of the SDIs recommended in the Baltimore Records and the District Court failed to consider whether the "array of SDIs" that were provided to R.J. were tailored to meet his needs. App. 68. The District Court reviewed the SDIs provided, which included a small classroom setting, cues to remain on task, extra time to complete tests, repeated directions, reading directions out loud, dictation to a scribe, seating near the instruction area, reduced written class work and tests, reduced number of tests or test items, and use of a calculator,[11] and found they were reasonably calculated to provide R.J. with meaningful educational benefit. While R.J.'s improvement at the Center suggests that these SDIs did not provide R.J. with the maximum educational benefit, Appellants have failed to demonstrate that these SDIs were insufficient to provide R.J. with a "basic floor of opportunity," which is all that the

_____

[11] The IEPs also adopted other recommendations from the Baltimore Records, including counseling, speech and language evaluation, and a phonics approach to reading in the Lindamood-Bell style.

10

IDEA requires. See Ridley, 680 F.3d at 269. Without evidence that other SDIs were needed to provide R.J. with a FAPE, Appellants' argument regarding the SDIs provided is insufficient to disturb the finding that his IEPs were adequate.[12] See id.

Second, Appellants contend that R.J.'s IEPs failed to provide adequate annual measurable goals.[13] While the 2006 IEP provided only three goals—one each for reading, writing, and math—his 2007 IEP contained only a reading goal and an incomplete math goal. Affording the District Court the required deference and based upon the record presented, we cannot conclude that the District Court erred in finding that the School District was not required to create "distinct measurable goals for each recognized need of a disabled student to provide a FAPE." App. 65. Furthermore, while Appellants' expert opined that the IEPs should have had additional goals, she does not explain how the presence of such goals were necessary to ensure R.J. received a FAPE. Though the School District certainly could have been more comprehensive, Appellants

---

[12] Appellants also contend that R.J.'s IEPs failed to address his attention deficit hyperactivity disorder, traumatic brain injury, and executive dysfunction because it did not adopt the recommendations from the Baltimore Records that addressed executive function, set forth supra footnote 2. While the education provided to R.J. would certainly have been enhanced by the inclusion of these SDIs, Appellants did not provide evidence that leaves us with the firm conviction that the District Court erred in determining that those SDIs were not necessary to provide R.J. a FAPE.

[13] Although Appellants claim that deficiencies in an IEP's goals constitute a procedural violation under the IDEA, a challenge to the content of an IEP "is concerned with the IEP's substance" and "does not implicate the IDEA's procedural requirements." D.S., 602 F.3d at 565. We therefore treat this argument as a substantive challenge.

failed to provide evidence that would permit us to disturb the District Court's finding that the IEPs were adequate.

Third, Appellants contend that the District Court erred in holding that R.J. received a FAPE based on his progress in reading fluency alone without considering R.J.'s lack of progress in other identified areas of need, namely writing and math. While the record is devoid of evidence of R.J.'s progress in math and writing, it does show that R.J. received passing grades in his math and writing special education courses. A court may consider a student's grades, including grades from special education courses, to evaluate the appropriateness of an IEP, if the court also considers the adequacy of the instruction provided.[14] D.S., 602 F.3d at 567-68. As the District Court considered the adequacy of R.J.'s education, or more specifically, the absence of evidence that it was inadequate, we cannot say that it clearly erred in finding R.J. was not denied a FAPE.

Fourth, Appellants contend that R.J. was denied a FAPE due to the School District's failure to address his behavioral needs. Specifically, they argue that the School District should have performed an FBA, provided cognitive behavioral therapy, and increased his counseling from thirty minutes per week, particularly as R.J.'s behavior

---

[14] Courts, however, "should not place conclusive significance on special education classroom scores" as "there may be a disconnect between a school's assessment of a student in a special education setting and his achievements in that setting and the student's achievements in standardized testing." D.S., 602 F.3d at 568. Had we reviewed this case without the confines of the standard of review, we may have disagreed with the weight given to the passing grades R.J. received, particularly since he received credit for assignments he completed, regardless of whether they were correct.

12

deteriorated.[15] The District Court found that "[w]hile R.J.'s behavior did appear to decline over the course of the two year period such that the school district may have been required to take further steps—like conducting an FBA—when creating a new IEP for the 2008-09 academic year, this issue is moot in light of R.J.'s departure from the [School] District at the beginning of the 2008-09 year." App. 62-63. Whether this issue was mooted by R.J.'s withdrawal or not, the District Court was presented with facts to support the view that an FBA was not required to ensure R.J. received a FAPE. According to Dr. Brooks, an FBA was not warranted as the behavioral issues were understood to stem from R.J.'s desire to return to Baltimore. Moreover, R.J.'s behavioral incidents did not result in any lost instructional time. Thus, we cannot say the District Court clearly erred.

Finally, Appellants contend that the District Court failed to account for R.J.'s individual potential. The record, however, shows that the District Court considered the Baltimore Records and testimony concerning R.J.'s specific needs and the services to address them. Thus, we cannot say the District Court failed to consider R.J.'s individual potential in assessing whether his IEPs were reasonably calculated to provide meaningful educational benefit. See T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 578 (3d Cir. 2000) (holding that court adequately considered student's individual potential where it relied on expert testimony that education program would "suit" the student's needs).

---

[15] Appellants also argue that the Behavioral Improvement Plan in the IEPs was inadequate because it was a generic form not tailored to R.J.'s needs. Absent a demonstration that it impeded R.J. from receiving a FAPE, however, we cannot disturb the District Court's finding.

13

Moreover, although R.J.'s reading improved significantly at the Center, and "evidence of a student's later educational progress may be considered in determining whether the original IEP was reasonably calculated to afford some educational benefit," D.S., 602 F.3d at 567 (internal quotations marks and alteration omitted), the Center focused only on reading. Furthermore, "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date." Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993). Therefore, because the evidence does not contradict the finding that R.J. was provided a FAPE, we are obligated to accept it as correct.[16]

IV

Although we affirm the District Court, we commend the compassion the Colemans exhibited towards R.J. Were our inquiry limited to rewarding the generosity of a loving family, we would almost certainly reach a different result. We are obliged, however, to apply the governing law, which requires that we affirm.

---

[16] As we affirm the District Court's finding that R.J. was not denied a FAPE, the IDEA, ADA, and RA claims must fail, D.K. v. Abington Sch. Dist., 696 F.3d 233, 253 n.8 (3d Cir. 2012), and we need not consider whether Appellants are entitled to tuition reimbursement, see C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 71 (3d Cir. 2010).